# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **LAURITZEN BULKERS A/S,** | § | |
| **Plaintiff,** | § | **CIVIL ACTION NO.** |
| | § | |
| **v.** | § | **22-cv-_____** |
| | § | |
| **EM RESOURCES LLC,** | § | **ADMIRALTY RULE 9(h)** |
| **f/k/a BORAL RESOURCES LLC,** | § | |
| **Defendant.** | § | |
| | § | |

## VERIFIED COMPLAINT

Plaintiff LAURITZEN BULKERS A/S ("Lauritzen" or "Owner") files this Verified Complaint against Defendant EM RESOURCES LLC ("EMR" or "Defendant"), formerly known as BORAL RESOURCES LLC ("Boral" or "Charterer") and alleges as follows:

## SUBJECT MATTER JURISDICTION

1.      This is an admiralty or maritime claim within the meaning of Federal Rule of Civil Procedure 9(h) and 28 U.S.C. § 1333.

## PARTIES

2.      Lauritzen is a foreign business entity organized and existing under the laws of Denmark. At all relevant times referred to herein, Lauritzen was the disponent owner of the vessel MV TIGER HEBEI ("the Vessel").

3.      Upon information and belief, Boral was a business entity organized and existing under the laws of Delaware, with a principal place of business in South Jordan, Utah.  Upon information and belief, EMR is a business entity organized and existing under

the laws of Delaware, with a principal place of business in South Jordan, Utah.  Upon information and belief, Boral changed its name to EM Resources LLC as of no later than February 25, 2022.

## FACTS

### The Voyage Charter

4.      By a voyage charterparty dated January 21, 2021, and recap of its main terms, Lauritzen fixed a vessel to be nominated to Boral as Charterer for the carriage of a cargo of Fly Ash (the "Cargo") from Krishnapatnam, India, to Stockton, California ("the Charter").

5.      The terms of the Charter are set out in a recap, which incorporates an amended proforma GENCON form and riders, true and correct copies of which are attached hereto as Exhibit 1 and are incorporated herein by reference.

6.      The recap of the main terms of the Charter described in Paragraph 7 provides in relevant part as follows:

> *ACCT: **BORAL RESOURCES LLC**  [emphasis added]*
> *FULL AND COMPLETE CARGO CONSISTING OF*
> *-27,500 MT MIN/MAX OF BAGGED FLYASH IN JUMBO BAGS 1.5 MT EACH. BAGS TO BE STACKED UPTO 7 TIERS HIGH.*
> *-ANY DUNNAGE / LASHING / SECURING MATERIALS TO BE PROVIDED BY CHARTERERS/SHIPPERS AT THEIR EXPENSE.*
> *-CARGO TO STOWED / SECURED / LASHED TO MASTERS SATISFACTION WHICH NOT TO BE UNREASONABLE.*

*-ALL DUNNAGE / LASHING / SECURING MATERIALS TO BE PROVIDED BY CHARTERS/RECEIVERS TO BE DISCHARGED AT CHARTERS TIME, RISK, AND EXPENSE.*

*-ALL DUNNAGE MATERIAL TO BE AS PER REGULATION IN USA AND INDIA*

*. . .*

*-DISCH: 1 SB STOCKTON.*

*. . .*

*-DISCH RATE:  5,000 MT PER 24 CONSECUTIVE HRS OR PRO RATA SHINC (EXCLUDING BIMCO HOLIDAYS).*

*. . .*

*DISCHARGING TIME CEASES TO COUNT UPON COMPLETION OF DISCHARGING CARGO AND CARGO HOLDS HAVE BEEN SHOVEL CLEANED AND ALL DISCHARGING EQUIPMENT INCLUDING BOBCATS, HAS BEEN TAKEN OUT OF CARGO HOLDS.*

*. . .*

*MASTER AND CREW TO BE FULLY COOPERATIVE IN SHIFTING VESSEL ALONGSIDE THE REPORTING TO CHARTERERS/AGENTS INFORMATION ON LOADING AND DISCHARGE DAILY OPERATIONS, TIME FOR SHIFTING TO BE ON CHARTERERS/RECEIVERS ACCOUNT.*

*. . .*

*FRT USD 35.75 PMT FIOS BASIS 1/1 ON A SEMI BOXED SHAPED VSL (BOXED IN HOLDS 2/3/4)*

*. . .*

*-DEMURRAGE: USD 12,000 PDPR / HALF DESPATCH (50%) BOTH PORTS WTSBENDS, SETTLEMENT OF DEMURRAGE/DISPATCH SHALL TAKE PLACE BY EMAIL WITHIN 30 DAYS FROM RECEIPT OF THE RELEVANT DOCUMENTS, NAMELY INVOICE, TIME SHEET AND*

*STATEMENT OF FACTS DULY SIGNED BY THE MASTER OF THE VESSEL AND THE AGENT AT THE LOADING/DISCHARGING PORT.*

*. . .*

*-THE STEVEDORES ALTHOUGH APPOINTED BY CHRS, SHIPPERS, RCVRS OR THEIR AGENTS TO BE UNDER THE DIRECTION AND CONTROL OF THE CAPT. . . . CHRS, SHIPPERS OR RCVRS SHALL NOT BE LIABLE FOR THE ACTS AND DEFAULTS OF THE STEVEDORES AT LOAD/DISCHG PORT(S) INCLUDING ANY/ALL ALLEGED DAMAGE STEVEDORE DAMAGE TO THE VESSEL . . . ALL CLAIMS FOR DAMGES ALLEGEDLY CAUSED BY STEVEDORES TO BE SETTLED DIRECTLY BETWEEN OWS AND STEVEDORES AT LOAD/DISCH PORT(S). HEVER, CHRS AGREE TO ASSIST OWS TO THE BEST OF THEIR ABILITIES IN RECOVERING CLAIMS FOR PROVEN DAMAGES IN CASE THE OWS HV DIFFICULTIES OBTAINING SAME. DISCHARGE PORT STEVEDORES/RECEIVERS ARE NOT TO BE HELD RESPONSIBLE FOR HIDDEN DAMAGES ATTRIBUTABLE TO PORT OF LOADING . . .*

7.     A "First Original" proforma Gencon incorporated into the Charter described in Paragraph 7 provides in relevant part:

**Charterers** [] ***Boral Industries Inc., 10701 S River Front Pkwy., Suite 300, South Jordan, UT 84095***, as Charterers . . .

**Cargo** [] load ***upto*** a full and complete cargo ***27,500 min/max metric tons of bagged flyash in jumbo bags 1.5 metric tons each.***

**Destination** [] Charterers bind themselves to ship, and . . . the vessel shll [sic] proceed to ***one (1) safe berth Stockton.***

**Owners Responsibility** 2. Owners are to be responsible for loss of or damage to the goods or for delay in delivery of the goods only in case the loss, damage or delay has been caused by the improper or negligent stowage of the goods (unless stowage performed by shippers or their stevedores or servants) or by

personal want of due diligence on the part of the Owners or their Manager to make the vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied or by the personal act or default of the Owners or their Manager. **Stowage to be under Master's supervision and stevedores shall be deemed servants/agents of the Master**.

And the Owners are responsible for no loss or damage or delay arising from any other cause whatsoever, even from the neglect or default of the Captain or crew or some other person employed by the owners on board or ashore for whose acts they would, but for this clause, be responsible, or from unseaworthiness of the vessel on loading or commencement of the voyage or at any time whatsoever. Damage caused by contact with or leakage, smell or evaporation from other goods *(not including bunkers)* or by the inflammable or explosive nature or insufficient package of other goods *(not including bunkers)* not to be considered as caused by improper or negligent stowage, even if in fact so caused.

. . .

**Demurrage** [] 8. **Owners shall have a lien on cargo for freight. Charterers shall remain responsible for dead-freight and demurrage incurred at port of loading**. Charterers shall also remain responsible for freight and demurrage incurred at port of discharge, but only to such extent as the Owners have been unable to obtain payment thereof by exercising the lien on the cargo.

. . .

**20.** . . . Discharging terms . . . Discharging time ceases to count upon completion of discharging cargo and cargo holds have been shovel cleaned and all discharging equipment including bobcats, has been taken out of cargo holds.

. . .

Master and crew to cooperate with buyer/receivers to avoid dust and spillage but buyer/receivers to be responsible for the handling and discharging of flyash on board to satisfy any environmental authorities' regulations.

. . .

Time to stop counting upon successful completion of unloading operations (time for draft survey/hold inspection not to count).

…

**21. Quantity/Cargo Lots** 27,500 min/max metric tons of bagged flyash in jumbo bags 1.5 metric tons each.

. . .

<u>Discharge:</u> One (1) safe port, one (1) safe berth Stockton. 5,000 metric tons per 24 consecutive hours or pro rata Saturday PM, Sundays, Holidays excluded (excluding super holidays in USA).

. . .

**22.** Demurrage rate: USD XXXX per day pro rata/half despatch (50%) both ports waiting time saved both ends. Settlement of demurrage/despatch shall take place by email within 30 days from receipt of the relevant documents, namely invoice, time sheet and statement of facts duly signed by the master of the vessel and the agent at the loading/discharging port.

. . .

**33.** With respect to the shipment, carriage and discharge of the cargo, whether or not a Bill of Lading or similar document of title is issued or regulates the relations between the carrier and holder of same , this Charter Party shall have the effect subject to the provisions of any legislation incorporating the Rules contained in the International Convention for the Unification of Certain Rules of Law Relating to Bills of Lading dated Brussels, August 24th, 1924 (The Hague Rules) or those Rules as amended by the Protocol signed at Brussels, February 23rd, 1968 (the Hague Visby Rules) and which is compulsorily applicable to the contract of carriage contained therein.

. . .

**36. Arbitration Clause** All disputes arising out of this contract or under the Bill of Lading issued shall be arbitrated at New York in the following manner; and be subjected to New York, US Law; one arbitrator is to be appointed by each of the parties hereto and a third by the two so chosen. . . Such arbitration is to be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc.

. . .

**39.** Any dunnage/lashing/securing materials to be provided by Charterers/shippers at their expense. Cargo to stowed/secured/lashed to master's satisfaction which not to be unreasonable. All dunnage material to be as per regulation in USA and India.

8.     On or about April 28, 2021, Owner nominated the "M/V TIGER HEBEI" ("the <u>Vessel</u>") as the performing tonnage under the Charter, and Charterer accepted the nomination.

**<u>Facts giving rise to the Maritime Claim</u>**

9.     At 19:12 local time on June 25, 2021, the Vessel arrived in Stockton, California.  *See* <u>Exhibit 2</u>, Vessel Notice of Readiness - Stockton, a true and correct copy of which is attached hereto and is incorporated herein by reference.

10.    The Vessel was berthed on June 29, 2021, with discharge of the Cargo by local stevedores commencing at 18:50 local time on June 29, 2021.  *See* <u>Exhibit 3</u>, Vessel Statement of Facts – Stockton, a true and correct copy of which is attached hereto and is incorporated herein by reference.

11.    Stevedores completed one full shift discharging the Cargo without incident. *See id.*

12.     During a second shift on June 30, the stevedores ceased discharging the Cargo as of 20:30 local time as a result of health and safety concerns related to breakage of the bags containing the fly ash Cargo.  *See id.*

13.     On July 7, 2021, after discharging approximately 590 bags of the Cargo, the stevedores confirmed they would not discharge the Cargo due to, relevantly, approximately 100 (or about 17%) of said bags being damaged per the stevedores' estimation, who cited integrity and tearing of the bags as a cause of damage. *See* Exhibit 4, Emails between Lauritzen and Boral dated July 12-13, 2021, true and correct copies of which are attached hereto and are incorporated herein by reference.

14.     Several 1.5 MT bags were later found to have weighted 2.0 MT or more, with numerous bags in excess of the 1.5 MT limit.  *See* Exhibit 5, Weight log of discharged bags dated July 14, 2021, a true and correct copy of which is attached hereto and is incorporated herein by reference.

15.     After Owner made several requests for Charterer to make alternative arrangements to discharge the Cargo and mitigate Owner's damages, the Vessel left berth at Stockton on July 25, 2021, at 16:42 local time.  *See* Exhibit 6, Lauritzen Laytime Calculations, a true and correct copy of which is attached hereto and is incorporated herein by reference.

16.     On July 26, 2021, at 18:48 local time, the Vessel departed anchorage at Stockton on Charterer's orders and awaited Charterer's further orders to proceed to an alternative discharge place, then contemplated as a location in Mexico or Texas. *See* Exhibit 3, Vessel Statement of Facts – Stockton.

17.     On or around August 13, 2021, the Vessel received orders from Charterer to proceed to Mazatlan, Mexico for final discharge.

18.     The Vessel arrived at Mazatlan on August 15, 2021, and commenced discharge operations on August 18, 2021.  Discharging operations concluded on September 4, 2021.  *See* <u>Exhibit 7</u>, Lauritzen Statement of Facts, a true and correct copy of which is attached hereto and is incorporated herein by reference.

19.     Following its departure from Mazatlan, the Vessel continued to Callao, Peru for bottom cleaning due to its extended stay at Stockton.

20.     The Vessel had been scheduled for a subsequent fixture on a different charter, which as a result of the delays in departing Stockton and discharge operations in Mazatlan, had to be renegotiated, with Lauritzen being required to pay a substantial ballast bonus.

**<u>Breach of the Charter</u>**

21.     Charterer is in breach of several obligations under the Charter. This includes without limitation (1) failure to provide sufficient dunnage that would comply with regulations in the US and (2) failure to provide the bags of contractual volume and overloading of the bags.

22.     As a result of the improperly bagged Cargo and insufficient dunnage, Owner incurred costs that pursuant to the terms of the Charter were for Charterer's account.  These costs include, but are not limited to:

> a. Wharfage and dockage fees (including agency fees) while the Vessel remained idle in Stockton for 25.5 days, during which time the Vessel was used as floating storage;

    b.  Time Charter hire;

    c.  Additional bunkers consumed;

    d.  Additional P&I Insurance;

    e.  Surveyors and legal costs;

    f.  Bottom cleaning;

    g.  Amended ballast bonus;

    h.  Port costs resulting from the Vessel remaining at berth in Stockton due to Charterer's lack of timely instruction; and

    i.  Demurrage in Stockton and Mazatlan, in excess of the laytime allotted by the Charter.

*See* Exhibit 8, Freight Final Statement, Lauritzen Invoice No. 020628FINV dated June 10, 2021 ("FFS"), a true and correct copy of which is attached hereto and is incorporated herein by reference.

23.    Despite Owner's demands for payment of these costs and others owed pursuant to the Charter from Charterer, later Defendant, no payment has been received, in breach of the terms of the Charter.

**Loss and Damage**

24.    By reason of Charterer's breach of the Charter, Owner suffered demurrage and/or detention damages of at least:

    a.  **US$825,633.33** in total demurrage as detailed in Exhibit 8 was incurred pursuant to the terms of the Charter, US$69,925.00 of which was calculated while at the loading port in Krishnapatnam, and

US$755,708.33 for the period when discharge of the Cargo could not be completed as a result of Charterer's failure to properly bag the Cargo and delay in instructing Owner, which Charterer has wrongfully failed and refused to pay in breach of the Charter;

b. In addition to, or if contrary to Owners' primary case, time on demurrage did not run after discharge of the Cargo in Stockton was discontinued, Charterer remains liable for damages for detention estimated at **US$1,254,185.63**, the Vessel having been detained by Charterer's wrongful failure and refusal to discharge the remaining Bulk Cargo on board the Vessel.

25. Further or alternatively, by reason of Charterer's failure and in breach of the Charter, Owners incurred **US$718,735.75** in additional expenses related to discontinuation of discharge of the Cargo in Stockton and completing the discharge in Mazatlan as a result Charterer's failures and delays, which Charterer wrongfully and in breach of the Charter failed and refused to pay, including:

a. US$35,219.74 in extra dockage and agency fees;

b. US$74,891.06 in disbursements in Mazatlan;

c. US$135,646.40 in additional bunkers consumed;

d. US$21,934.17 in P&I insurance, surveyors, and legal costs;

e. US$16,030.00 in bottom cleaning expenses;

f. US$200,000.00 in amended ballast; and,

       g.     US$235,014.38 in lost earnings from the renegotiation of the follow on fixture of the Vessel, based on a difference of US$5,050.00 hire rate per day for 46.375 days.

*See* Exhibit 8.

26.    Plaintiff thereby sustained damages in the total principal amount of up to **US$1,972,921.38**, (US$1,254,185.63 + US$718,735.75) plus any applicable attorney's fees, costs, and interest.

**Pending Arbitration**

27.    Clause 36 of the Charter provides that all disputes between the parties shall be submitted to arbitration in New York, with New York, US Law to apply thereto. *See* Exhibit 1.

28.    In accordance with the foregoing, Owner has taken steps in preparation for commencing arbitration in New York against Defendant.

29.    Owner has requested security from Defendant with respect to its damages, which Defendant has refused to provide.

30.    Owner reserves all rights to seek increased security as may be needed in this proceeding. Likewise, Owner reserves all rights to seek and recover the full quantum of its damages, attorneys' fees, costs, interest, and other expenses in arbitration in New York.

**BREACH OF MARITIME CONTRACT UNDER U.S. LAW**

31.    Paragraphs 1 through 30 of this Verified Complaint are repeated and realleged as if the same were set forth here at length.

32.     Charterer breached its obligations to perform under the Charter in the various ways set forth above, and Charterer and Defendant have breached the Charter by failing to make timely payments of the amounts that accrued as a result, as set forth above.

33.     The Charter is a maritime contract under the General Maritime Law of the United States, as it is a voyage charter party for vessel services.

34.     By failing to pay the amounts owed to Plaintiff, Defendant has thereby breached a maritime contract under the General Maritime Law of the United States.

## SUPPLEMENTAL RULE B ALLEGATIONS

35.     Paragraphs 1 through 30 of this Verified Complaint are repeated and realleged as if the same were set forth here at length.

36.     As set forth above, pursuant to the Charter, the underlying merits of the dispute are being resolved by arbitration in New York. Owner expressly reserves all its rights to continue to arbitrate the merits of the underlying dispute.

37.     Owner brings this action solely to obtain *quasi in rem* jurisdiction over Defendant, to secure the claims being pursued in the New York arbitration more fully described above.

38.     Upon information and belief, and after investigation, Defendant cannot be found within this District within the meaning of Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure (*see* accompanying Declaration of Nicholas W. Paine).

39.     Owner is accordingly entitled to attach Defendant's property within this District pursuant to the provisions of Supplemental Rule B of the Federal Rules of Civil Procedure ("Supplemental Rule B").

40.     Upon information and belief, Defendant has or will have during the pendency of this action, property within this District and subject to the jurisdiction of this Court.

41.     Upon information and belief, Defendant's specific, known assets subject to attachment and located within the District are attached hereto in Schedule A, which is hereby incorporated by reference, and include, but are not limited to, real property, equipment, and fly ash inventory.

42.     Plaintiff seeks an Order from this Court directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Supplemental Rule B, attaching, *inter alia*, any assets of Defendant located within the District, including the assets identified in Schedule A, for the purpose of obtaining personal jurisdiction over Defendant and to secure Plaintiff's claims, as described above.

WHEREFORE, Plaintiff prays for the following:

(A)     That process in due form of law issue against Defendant citing it to appear and answer under oath all and singular the matters alleged in this Verified Complaint, failing which default judgment be entered against it in the sum of US$1,972,921.38 plus any applicable attorneys' fees, costs and interest to which Plaintiff may be entitled, whether in equity or at law;

(B)     That since Defendant cannot be found within this District pursuant to the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal

Rules of Civil Procedure, the Court issue an Order directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Supplemental Rule B, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any funds up to the amount of US$1,972,921.38, belonging to, due or being transferred to, from or for the benefit of Defendant, including, but not limited to such property as may be held, received or transferred in Defendant's name or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of garnishees to be named, and including the assets identified in Schedule A, adopted herein by reference, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Rule B answer the matters alleged in this Verified Complaint;

(C)    That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

(D)    That this Court recognize and confirm any award or judgment(s) rendered on the claims against Defendant set forth herein as a judgment of this Court;

(E)    That this Court award Plaintiff the attorneys' fees and costs incurred in this action as applicable, and any applicable interest; and

(F)    For such other and further relief as the Court deems just and proper.

Respectfully submitted,

*/s/ Nicholas W. Paine*

Nicholas W. Paine
Attorney in Charge
Texas Bar No. 24083614
Fed ID: 2385694
215 Park Ave. South, 11th Floor
New York, New York 10003
Telephone: 917-882-4566

OF COUNSEL:
**Zeiler Floyd Zadkovich (US) LLP**
215 Park Ave. South, 11th Floor
New York, New York 10003
*Attorneys for Plaintiff*



Lauritzen Bulkers A/S
15 Tuborg Havnevej
2900 Hellerup
Denmark

Phone:     +45 3396 8000
www.lauritzenbulkers.com
CVR:          55700117

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, Tamara Buijsse declares are follows:

I am Legal Counsel of Plaintiff, Lauritzen Bulkers A/S and have been so affiliated at all times referred to in the foregoing Verified Complaint. I have read the foregoing Verified Complaint and know the contents thereof. I verify that I believe the allegations contained therein to be true to my own knowledge, except as to matters stated to be upon information and belief, and as to those matters I believe them to be true. The grounds for my belief are based upon my personal knowledge gained during the course of my professional duties as Legal Counsel and my review of and familiarity with correspondence and other relevant documents, including the exhibits to the foregoing Verified Complaint.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 14th day of September, 2022 in Hellerup, Denmark.

Tamara Buijsse

## <u>SCHEDULE A</u>

1.      Front End Loader

2.      Conveyor System and Terminal

3.      Inventory of Fly Ash

4.      As detailed in the Verified Complaint, the foregoing property is located at,
        and attachable real property may include:

        Boral Resources Houston Storage Facility
        415 Transport Drive
        Baytown, TX 77523